IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| CHRISTINA ANN GRAHAM, Individually and as Anticipated Administrator of the ESTATE OF NELSON LEE GRAHAM, JR., Deceased,<br><br>    Plaintiffs,<br><br>v.<br><br>DEPUTY MADISEN EMERSON, DEPUTY KEVIN CLARKE, and DEPUTY ELVIN THOMPSON,<br><br>    Defendants. | CASE NO.: 1:23-CV-180 |

## **PLAINTIFF'S DISCLOSURE OF EXPERTS**

Plaintiff hereby provides notice that she may call the following to provide expert testimony at the trial of this matter and further states as follows:

1. Plaintiff has retained the following expert who is expected to testify at trial: Geoffrey P. Alpert, Ph.D. Mr. Alpert is expected to testify regarding the contents of his Preliminary Report, which is attached hereto as Exhibit "A" and incorporated herein by reference as if fully set forth verbatim. Plaintiff will provide a supplemental report as discovery progresses.

2. Plaintiff may also introduce fact witness Mithilesh Siddu, MD, as an expert witness regarding the cause of Nelson Lee Graham, Jr.'s death.

3. Plaintiff may also introduce fact witness Kenneth Edward Boose, Deputy County Coroner, as an expert witness regarding the cause of Nelson Lee Graham, Jr.'s death.

4. Plaintiff may also introduce fact witness Mark Bowen, County Coroner, as an expert witness regarding the cause of Nelson Lee Graham, Jr.'s death.

5. Plaintiff further reserves the right to examine the following as experts:

    a. Any expert designated by Defendants.

    b. Healthcare providers of Nelson Lee Graham, Jr..

    c. By naming these persons, Plaintiff does not concede any particular expertise on the part of Nelson Lee Graham Jr.'s care providers or witnesses designated by Defendants.

6. Plaintiff reserves the right to amend this disclosure.

This 12th day of April, 2024.

                              **ERIC J. HERTZ, PC**

                              */s/ Eric J. Hertz*
                              JESSE A. VAN SANT
                              Georgia Bar Number 558101
                              *jesse@hertz-law.com*

8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
Phone: (404) 577-8111
Fax: (404) 577-8116
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that the undersigned on this date served **PLAINTIFF'S DISCLOSURE OF EXPERTS** upon the following counsel in accordance with ECF rules by electronically filing a copy with the Clerk of Court using the CM/ECF system , or by depositing a copy in the United States Mail with adequate postage thereon to:

> Randolph Frails
> Tameka Haynes
> Frails & Wilson LLC
> 211 Pleasant Home Road, Suite A1 Augusta, GA 30907
> *randyfrails@frailswilsonlaw.com*
> *thaynes@frailswilsonlaw.com*

This 12th day of April, 2024.

**ERIC J. HERTZ, PC**

*/s/ Eric J. Hertz*
JESSE A. VAN SANT
Georgia Bar Number 558101
*jesse@hertz-law.com*

8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
Phone: (404) 577-8111
Fax: (404) 577-8116
*Counsel for Plaintiffs*

# Geoffrey P. Alpert

1900 Heyward St., Columbia South Carolina 29205 USA
Telephone: (803) 446-4139 ☎

April 11, 2024

PRELIMINARY REPORT

RE: Graham v Emerson et al.

I declare that the following statements reflect objective truth as extracted from records provided to me by Attorney Eric Hertz and represent my expert opinions, to a reasonable degree of professional certainty. If called to testify in this matter, I will express the opinions contained in this report unless provided with materials that change my opinions.

My current position is Professor of Criminology and Criminal Justice at the University of South Carolina. I have a Ph.D. in Sociology from Washington State University and have conducted research on police policies and customs for the past thirty-five years. In addition to my academic experience, I have been awarded federal, state and local grants to investigate various aspects of police work. Specifically, I have been awarded grants to study the use of force and police pursuit driving from the National Institute of Justice, the research arm of the U.S. Department of Justice. I have been awarded several fellowships to investigate police activities and I have been asked by numerous police agencies to write policies for them, conduct training and to consult with them on various issues and critical incidents. I have served on policy panels for IACP and am currently a Federal Monitor for the New Orleans Police Department Consent Decree and a compliance team member for the Portland, Oregon Police Bureau.

My record of publication includes more than 15 books and 150 peer-reviewed articles on Criminal Justice, many of which deal with police policies, practices, training and customs of police departments. My areas of specialization include police driving, the use of force and the use of deadly force. I have published extensively in criminal justice, including scholarly articles concerning internal affairs, early warning systems, high speed pursuits and the use of force.

To ensure my methodology is reliable, my process begins with a comprehensive review of the provided materials and data without assigning credibility to any witness but instead looking at all the materials objectively in order to establish my understanding of the facts of the case. I then review applicable professional codes, and training standards, and generally accepted principles and practices in policing as of the date of this incident. My opinions are based on this review compared to generally accepted principles. "Generally accepted practices" refers to those protocols, techniques, and procedures that are widely known, acknowledged, and relied upon in the field. A principle or practice is generally accepted when well-educated, well-trained, and experienced professionals would agree that it is conventional, customary, and reasonably standard.

While there is no single, universal standard for establishing generally accepted police practices, it does not follow that none exist. Generally accepted principles and practices in policing reflect technical and specialized knowledge in the law enforcement field. A principle or practice can be generally accepted without necessarily being universally adopted or rising to the level of a long-established, empirically validated best practice. Generally accepted principles and

1

EXHIBIT A

practices may be but are not necessarily reflected in Department of Justice consent decrees, publications by professional associations (such as the International Association of Chiefs of Police, the Police Executive Research Forum, the National Police Institute, etc.), in well-developed agency policies, and in reputable training materials.

      To identify and apply the applicable generally accepted principles and practices in policing, I base the statements contained herein on the totality of my specialized knowledge in the field of police policies, practices and customs which has developed during decades of involvement in law enforcement in various capacities as a criminologist, researcher, consultant, auditor, evaluator, and trainer. My examination of the issues in this case embodies the fundamental methodology that I employ in my professional evaluations of police agencies as a consultant when performing research work with, or for police agencies or governmental entities such as cities, counties or the Department of Justice; and when writing for reputable academic publishers. The methodology I applied in this case is consistent with the methodology utilized by other experts in the field of law enforcement when analyzing incidents of this type.

      Central to the evaluation of police use-of-force incidents is the distinction between 'threat' and 'risk.' More than twenty years of empirical research has demonstrated distinctions between threat and risk, and how this distinction impacts officers' use-of-force decision-making.[1] Additionally, there is strong empirical evidence that officers operationalize the components of imminent threat - ability, opportunity, and apparent intention - in the daily performance of their duties. Recently, an experimental study of threat assessment among officers using body-worn camera video confirmed that a threat assessment model involving specifically the evaluation of a subject's ability, opportunity, and apparent intention to cause harm was consistent with officers' cognitive processes during threat assessment.[2] While the nature of the subject's resistance is a relevant consideration in officer threat assessments, officers consider factors beyond resistance—specifically ability, opportunity, and apparent intention.[3] Additionally, A large scale study of use-of-force reports from almost 100 agencies found that each of the three conditions; ability, opportunity, and apparent intention were statistically to force levels.[4] The study also found that the conditions were interactive, in that when taken together they were predictive of force used. In short, police policy documents, training, and actual field practices establish the generally accepted practice of defining and assessing threat by evaluating the subject's ability, opportunity, and apparent intention to cause a specific harm.

      The opinions in my report relate to whether the actions or decisions under consideration were handled consistently with the well-known and generally accepted principles and practices in policing. My use of terminology such as "excessive," "unreasonable," and "disproportionate," etc., should be read as references to the professional and generally accepted standards in policing

---

1. P. Colin Bolger, Just Following Orders: A Meta-Analysis of the Correlates of American Police Officer Use of Force Decisions, 40 Am. J. Crim. Just. 466 (2015); Rob Tillyer, Unpacking Sequential Actions Within Use of Force Incidents, 25 Police Quarterly (2022); Geoffrey P. Alpert, & Roger G. Dunham, Understanding Police Use of Force: Officers, Suspects, and Reciprocity (2004). William Terrill & Michael D. Ressig, Neighborhood Context and Police Use of Force, 40 J. Research Crim. & Delinquency 291 (2003); Joel H. Garner et al., Characteristics Associated with the Prevalence and Severity of Force Used by the Police, 19 Just. Quarterly 705 (2002); Geoffrey P. Alpert & John M. MacDonald, Police Use of Force: An Analysis of Organizational Characteristics, 18 Just. Quarterly 393 (2001).
2. Kyle McLean et al., Re-examining the Use of Force Continuum: Why Resistance is Not the Only Driver of Use of Force Decisions, 26 Police Quarterly 85 (2023).
3. Kyle McLean et al., Re-examining the Use of Force Continuum: Why Resistance is Not the Only Driver of Use of Force Decisions, 26 Police Quarterly 85 (2023).
4. Andrew T. Krajewski et al., Threat Dynamics and Police Use of Force, 61 J. Research Crim. & Delinquency 1 (2023).

and is not intended and should not be interpreted as references to or the application of legal standards which is within the sole province of the factfinder or judge. My opinions and any related testimony about police uses of force, including decision-making, emergency driving, police training, and are relevant areas that concern issues of which lay jurors are unaware or about which they frequently have misconceptions. My testimony would assist a factfinder in understanding the evidence presented to them. My opinions are provided with a reasonable degree of professional certainty within the fields of law enforcement policies, practices, training and supervision. My fees are $495 per hour, and I receive $2,500 for four hours or less in a deposition or at trial. I was asked to review these materials in March 2024. I reserve the right to amend this report should additional materials become available.

**Documents Reviewed:**

1. 2023 01-26 Docs Produced by AmericanWork
2. 2023 02-17 Response to Open Records Request (Richmond County Sheriff's Office)
3. 2023 08-10 Response to Anti-Litem Notice
4. 2023 08-31 Richmond Coroners Office Autopsy
5. 2023 11-30 Nelson Graham CMP and Exhibit A
6. 2023 06-15 Ante-Litem Notice – Notice of Claim – Graham Nelson
7. DC [Death Certificate] Updated
8. GBI Docs Produced [Folder]
    a. Face Sheet Redacted
9. MR-BR [Medical Record-Billing Record] Gold Cross EMS (2023 03-21)
10. Nelson Graham Jr. Police Report
11. Preliminary DC
12. Report from Richmond County Sherriff's Office Nelson Graham
13. 2011 PEERF Report on Tasers
14. IACP Model Policy and Concept and Issues Paper on Tasers
15. Armstrong v Pinehurst (4th Cir)

**Incident Assessment**

On Friday, December 16, 2022, at approximately 10:15P.M., Mrs. Christine Graham called the mobile crisis hotline in Richmond County a second time indicating she had called earlier and filed a 1013 (an order for Mr. Graham to be transported for evaluation), for Mr. Nelson Graham, who was acting erratically. Sheriff's deputies Kevin Clarke and Madison Emerson responded to the Graham residence at 1927 George Road, Augusta, Georgia, to serve a court order to transport Mr. Graham for a mental health Mr. Graham had a history of mental illness including paranoia, auditory hallucinations, and was diagnosed with schizoaffective disorder (Notes from American Work LLC).

According to the Richmond County Sheriff's Office Case Report (2022-0029552) the deputies contacted Mr. Graham who was in his bedroom sitting on his bed with his arms folded. It is noted in Deputy Elvin Thompson's report:

> Deputies were speaking with Nelson Graham for a while, before it was determined they would need to assist him out of the residence to transport him. Deputies grabbed Nelson

3

> Graham's arms attempting to unfold them from over his chest with Nelson Graham passively resisting via refusing to give Deputies his arms. Deputies continued attempting to restrain Nelson Graham's arms, all three ultimately ending onto the ground with Nelson Graham bringing his arms back in front of chest beneath him, keeping them out of Deputes reach as they attempted to physically detain him. Deputy Emerson gave Nelson Graham verbal commands which were ignored before she activated her X-26 Taser, releasing a single cartridge into Nelson Graham with no visible effect.
>
> Deputies continued attempting to detain Nelson Graham who remained dead weight, covering his arms. Deputy Emerson deployed her second taser cartridge still showing little to no effect on Nelson Graham, and drive stunned him several times. Deputy Emerson had managed to secure his right wrist into a handcuff, Deputy Clarke went over the radio requesting more deputies for assistance with Nelson Graham. I, Deputy Thompson responded, assisting Deputy Emerson in securing his left wrist into the handcuff while Deputy Clarke was still restraining Nelson Graham.
>
> With Nelson Graham physically detained, Deputies gave him verbal commands to stand up so we could get him from the bedroom and out of the residence into the back of a marked patrol car with no response from Nelson Graham. Deputies moved Nelson Graham from the bedroom into the living room who was still dead weight and had not spoken a word. Once in the living room Deputies assessed Nelson Graham once again before beginning CPR. Deputy Emerson retrieved and utilized her Narcan (4mg) on Nelson Graham with no reaction. Deputies continued compressions when first responders Engine 6 responded taking over. Gold Cross Med unit 2 arrived taking over, securing Nelson Graham and transporting him to AUMC.

It is noted in the Complaint (and taken from a statement provided by Mr. Graham's sister, Courtney Hankerson, during an interview) that when the deputies walked in his bedroom he stood up and walked to the threshold of his bedroom and stated, "I am not a criminal" and asked, "why are you here?" At that point Deputy Clarke grabbed Mr. Graham who kept his arms folded in front of his body and was told by Deputy Emerson "Stop resisting or I'm going to tase."

Richmond County Sheriff's Office Case Report Narrative admits Mr. Graham was "passively resisting via refusing to give Deputies his arms." Deputy Clarke then tackled Mr. Graham and Deputy Emerson deployed her X26 Taser while he was face down on the floor with his hands underneath him. According to Deputy Thompson's report, Deputy Emerson drive stunned Mr. Graham several times with her Taser and deployed a second cartridge, while admitting that Mr. Graham was "dead weight [and] covering his arms." Deputy Clarke handcuffed Mr. Graham's right wrist, and Deputy Thompson along with Deputy Emerson handcuffed Mr. Graham's left wrist. Deputy Clarke and Deputy Emerson used physical force on Mr. Graham to pin him facedown into the floor, arms hand-cuffed behind him, and then applied pressure to his body and limbs to hold him immobilized in that position. Mr. Graham was told to stand up, but he could not respond. The Deputies then picked up Mr. Graham and moved him from his bedroom into the living room. All attempts, including the use of Narcan to revive Mr. Graham were unsuccessful.

4

The Augusta-Richmond County Coroner Coroner's Investigative Report identified that Mr. Graham's death was a homicide and the cause of death to be a "Physical alteration involving prone positions, mechanical asphyxia, and electroconductive device use in the setting of schizoaffective disorder."

There are several guides for the law enforcement community when it comes to the use of a Taser. First, the International Association of Chiefs of Police (IACP) has issued a Model Policy, Concepts and Issues paper and a Need to Know document.5 The IACP informs law enforcement:

> C. ECW as Use of Force
> The use of an ECW is a use of force, and each application of an ECW is an additional use of force. ECWs should be used in a manner consistent with the agency's policy on use of force. Officers should use only the amount of force that is objectively reasonable to effectively bring an incident under control. It is important to note that, as with other force options, warnings should be issued prior to use when practical, and the use or impracticality of such use should be referenced in the agency use-of-force report.
>
> As with any force option, the device is not without risks. Accordingly, officers and agencies must guard against becoming overly dependent on the ECW to include using it improperly or to the exclusion of other more reasonable force options. In the final analysis, the decision to use an ECW must be based on the totality of circumstances reasonably balancing the need to use force and the reasonably foreseeable potential consequences. Any decision to apply multiple applications of an ECW must take into consideration whether a subject is capable of complying with the officers' commands. Handcuffing under power is preferred over multiple ECW activations. Multiple applications of an ECW cannot be justified solely on the grounds that a subject fails to comply with a command, absent other indications that the subject is about to flee or poses an immediate threat to an officer. The ECW is not intended to replace the use of firearms when deadly physical force is necessary, but rather to provide an alternative to be used when appropriate and within the guidelines of the department's use-of-force policy.

The IACP Law Enforcement Policy Center published an Issues and Concept Paper in 2018 (P. 4) that informed the law enforcement community:

> However, ECW use should be prohibited on those who passively resist when they are not reasonably perceived as an immediate threat or flight risk. For the purposes of this document, passive resistance is defined as a refusal to comply by an unarmed person with an officer's verbal commands or physical control techniques that does not involve the use of physical force, control, or resistance of any kind. Additionally, the ECW should generally not be used in the following situations:
> > • On individuals in restraints, except as objectively reasonable to prevent their escape or prevent imminent bodily injury to the individual, the officer, or another person. However, in these situations, only the minimal amount of force necessary to control the situation shall be used.

---

5. www.theiacp.org/sites/default/files/2023-09/Electronic%20Control%20Weapons%20-%202023.09.pdf

> • When the officer has a reasonable belief that deployment may cause serious injury or death from situational hazards including falling, drowning, or igniting a potentially explosive or flammable mate- rial or substance, except when deadly force would be justified.
> • When the suspect's movement or body positioning prevents the officer from reasonably targeting or maintaining appropriate body part targeting.

Second, The Police Executive Research Forum published "Electronic Control Weapons Guidelines."6 This guide to law enforcement notes high-risk populations and the concerns about positional asphyxia and states (P. 14):

> Some populations currently believed to be at a heightened risk for serious injury or death following an ECW application include pregnant women, elderly persons, young children, visibly frail persons or persons with a slight build, persons with known heart conditions, persons in medical/mental crisis, and persons under the influence of drugs (prescription and illegal) or alcohol. Personnel should be trained about the medical complications that may occur after ECW use and should be made aware that certain individuals, such as those in a state of excited delirium, may be at a heightened risk for serious injury or death when subjected to ECW application or other uses of force to subdue them.

> Agencies also need to be cognizant of how positional asphyxia may exacerbate the condition of any individual who has received an ECW application. Positional asphyxia is a death that occurs when a subject's body position interferes with breathing, either when the chest is restricted from expanding properly or when the position of the subject's head obstructs the airway. Positional asphyxia has been mentioned as a possible contributing factor in a number of cases in which subjects died after one or more ECW applications. Police personnel should be trained to use a restraint technique that does not impair a subject's respiration following an ECW application.

More specifically, the PERF guidelines note (P. 18, 19):

> 14. Training protocols should emphasize the risk of positional asphyxia, and thus officers should be trained to use a restraint technique that does not impair the subject's respiration following an ECW application.

> 16. Agencies' policy and training should discourage the use of the drive stun mode as a pain compliance technique. The drive stun mode should be used only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject so that officers can consider another force option.

> 17. Personnel should be trained to attempt hands-on control tactics during ECW application, including handcuffing the subject during ECW application (i.e., handcuffing under power). Training should emphasize that personnel who touch a subject during ECW application will not receive exposure to the electrical charge, so long as caution is taken not

---

6. www.policeforum.org/assets/docs/Free_Online_Documents/Use_of_Force/electronic%20control%20weapon%20guidelines%202011.pdf

6

to touch the subject along the circuit (i.e., between the locations of the two probes).

Third, the 4th Circuit case, Estate of Ronald Armstrong v. The Village of Pinehurst, No. 15-1191 (4th Cir. 2016)[7] at 22 informs us that:

> Force that imposes serious consequences requires significant circumscription. Our precedent, consequently, makes clear that tasers are proportional force only when deployed in response to a situation in which a reasonable officer would perceive some immediate danger that could be mitigated by using the taser.

The court explained that Armstrong's mental health status was a crucial consideration for the level of force used by the officers. The opinion pointed out that the management of an unarmed, emotionally disturbed individual should fundamentally differ from the methods used to apprehend a potentially dangerous suspect. Additionally, the court considered the issuance of the commitment order, which identified Armstrong as a danger solely to himself and reasoned that using force that could harm him contradicted the government's rationale behind the seizure.

While the court conceded that some level of force might be reasonable to protect Mr. Armstrong, it decided the use of a Taser as disproportionate to the situation. The judgment emphasized that a failure to follow lawful orders could warrant force, but the extent of justified force should be closely correlated with the specific level of resistance.

**Summary and Opinions**

1. Mr. Graham was in crisis when his wife called to have him transported for evaluation.
   a. Mr. Graham passively resisted the deputies when they attempted to put handcuffs on him.
   b. Mr. Graham ignored verbal orders and was tackled by Deputy Clarke and "tased" by Deputy Madison Emerson.
2. Deputy Clarke did not need to tackle Mr. Graham as he or the other deputies could have used de-escalation techniques to try and convince his he needed to be transported for evaluation.
   a. The tackling of Mr. Graham, a passively resisting individual who was in crisis is a violation of accepted police practice, unreasonable and an excessive use of force.
   b. Once Deputy Clarke tackled Mr. Graham, the other deputies should have been able to control Mr. Graham with ground control tactics.
   c. Deputy Madison's use of a Taser on Mr. Graham, an unarmed, passively resisting individual violates accepted police practices, unreasonable and an excessive use of force.
3. Deputy Madison had other ways to get Mr. Graham to comply with their orders to get his hands out from his body.

---

7. www.ca4.uscourts.gov/Opinions/Published/151191.P.pdf

7

      a. There were three deputies who were at the scene with Mr. Graham.
          i. De-escalation techniques could have been used.
          ii. Deputies could have waited and talked with Mt. Graham and tried to explain the situation to him and that they were there to assist him.
          iii. The deputies could have called a mental health professional to ask how to communicate with him.
          iv. There was no need to rush Mr. Graham who may have been having trouble understanding their orders or why they were giving him commands.

4. Deputy Madison's second Taser deployment violated accepted police practices and was unreasonable and an excessive use of force.
5. Deputy Madison's use of a Taser for pain control on a passively resisting individual violates customary police practice and was unreasonable and an excessive use of force.
6. Leaving Mr. Graham on his stomach, in a position of compression or asphyxia (positional asphyxia) for more time than necessary is unreasonable and a violation of accepted police practice.

*Geoffrey P. Alpert*
Geoffrey P. Alpert